UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATE OF AMERICA | **04 CR 1 0 0 8 2 MLW** <br> CRIMINAL NO. |
| v. | VIOLATIONS: |
| ERIC EDWARD RESTEINER, <br><br> Defendant. | 18 U.S.C. § 1343 (Wire Fraud) <br> 18 U.S.C. § 1341 (Mail Fraud) <br> 18 U.S.C. § 1956 (Money Laundering) <br> 18 U.S.C. § 2 (Aiding and Abetting) |

## INDICTMENT

The Grand Jury charges that at all times relevant to the Indictment:

### INTRODUCTION

1.  Defendant, **ERIC E. RESTEINER** (hereinafter, "**RESTEINER**") was an individual who, at times relative to the matters herein, lived principally in Lyford Cay, Nassau, Bahamas and St. Moritz, Switzerland. At all times relative to this Indictment, defendant **RESTEINER** offered a high-yield investment program promising high returns with no risk to investors.

2.  Miles M. Harbur ("Harbur") was an individual who lived in Weston, Massachusetts and Lyford Cay, Nassau, Bahamas. Harbur was introduced to the high-yield investment program offered by defendant **RESTEINER** and became an early investor. Thereafter, Harbur functioned as an agent or intermediary for defendant **RESTEINER** by referring new investors, providing wire transfer instructions, and making periodic payments to investors for what he was told was a return on their investment.

3. Donald Chamberlin ("Chamberlin") was an individual who lived in Gross Point, Michigan. Chamberlain was an investment advisor who conducted his business under the name Shore Harbour Capital Management. Like Harbur, Chamberlain acted as an intermediary for defendant **RESTEINER** by referring investors, many of them his clients, to the high-yield investment program offered by defendant **RESTEINER**. Chamberlin's clients invested funds with defendant **RESTEINER** through bank accounts maintained at Barclays Bank, PLC, in Nassau, Bahamas, in the names of European Growth Fund, International Growth Ltd, and Badefisa, S.A.

4. Voldemar VonStrasdas ("VonStrasdas") was an individual who lived in Palm Beach, Florida, and Lyford Cay, Nassau, Bahamas. VonStrasdas, like Harbur and Chamberlin, functioned as an agent for defendant **RESTEINER** by recruiting new investors, providing investors with information about the purported investment, accepting applications for investment subscriptions, accepting payments from investors and forwarding these to defendant **RESTEINER**, calculating monthly returns due to investors, and distributing the purported monthly investment returns to investors.

5. Charles Dyer was an individual who lived in Manchester, Massachusetts. Dyer was introduced to defendant **RESTEINER** by VonStrasdas and also functioned as an agent for defendant **RESTEINER** by recruiting new investors, accepting investment funds, transferring funds to defendant **RESTEINER**, preparing periodic account statements for investors, and distributing the purported investment returns to investors. Dyer, in conjunction with VonStrasdas, used the name Resource F in conjunction with the investment with

defendant **RESTEINER**

6. Defendant **RESTEINER**, with the assistance of Harbur, Chamberlin, VonStrasdas, and Dyer, created and executed a scheme by which he defrauded approximately 50 investors out of more than $30 million, through his operation of a purported high-yield, international bank trading investment program. In the scheme, prospective investors were told that they would receive very high rates of return on an investment where defendant **RESTEINER**, a trader who had a special license, could go to top international banks and buy high-yield, high-quality debt instruments issued by banks at a discount and resell them to another bank at a premium. These representations, and others made by defendant **RESTEINER**, were false and fraudulent. Defendant **RESTEINER** never invested the money that he, and others working as his agents, took into the purported trading program. Instead, most of the so-called "investment" proceeds were transferred, at the instruction of defendant **RESTEINER**, into bank accounts which he controlled. In fact, defendant **RESTEINER** used the investor's own money, and that of subsequent new investments, to pay investors the purported return on their investments and for his own benefit, as further set forth below.

## THE SCHEME TO DEFRAUD

### COUNTS 1 - 11
### WIRE FRAUD (18 U.S.C. § 1343)

The Grand Jury further charges:

7. Paragraphs 1 - 6 of this Indictment are incorporated herein by reference.

8. It was part of the scheme and artifice to defraud that between May 1997 and June 2000, defendant **RESTEINER**, assisted by others, made the following false representations to prospective investors: (1) that he was a licensed trader, one of only a handful of people in the world permitted to do so-called "off-balance sheet" trading, (2) that his trading program would pay an annual return of no less than 50 percent, (3) that he would obtain such a return through trading a series of instruments, a European investment technique known as "forfeiting," (4) that these instruments were backed by Double A rated banks, and (5) that the investors' principal would never be at risk because these instruments could be cashed in at the banks at any time. In fact, as defendant **RESTEINER** well knew, he was not a trader and had no way to generate income to provide the promised returns, the victims' principal was not safe and, in fact, was being used for his own personal use and to pay purported "interest" payments to victims in order to lure more investors and more money into the scheme.

9. It was further part of the scheme and artifice to defraud, that defendant **RESTEINER**, and others working as his agents, told potential investors that they would be committing their principal for a twelve-month period, could elect to receive monthly payments throughout that time, and that at the end of the year, could either keep their money in the program or take it out.

10. It was further part of the scheme and artifice to defraud that defendant **RESTEINER**, a journal-listed practitioner in the Church of Christ Scientist ("CCS"), told potential investors that becoming a trader was a God-given gift that he wanted to share with fellow Christian Scientists.

11. It was further part of the scheme and artifice to defraud that defendant **RESTEINER** recruited a select group of intermediaries or agents, individuals of some wealth, frequently affiliated with the CCS, who had access to other wealthy potential investors. These individuals included Harbur, Chamberlin, VonStrasdas, and Dyer.

12. It was further part of the scheme and artifice to defraud that defendant **RESTEINER** opened, established, and operated bank accounts at Barclays Bank, PLC, Nassau, Bahamas, in the names of Osaka International S.A. ("Osaka"), Wall Street South Corporation ("WSSC"), and Swiss Asset Management ("SAM"), for which he was the sole authorized signor.

13. It was further part of the scheme and artifice to defraud that defendant **RESTEINER** directed investors, either directly or indirectly through Harbur, Chamberlin, VonStrasdas and Dyer, to transfer funds for investment to the Osaka, WSSC, and SAM bank accounts he controlled.

14. It was further part of the scheme and artifice to defraud that defendant **RESTEINER**, directly and through his agents, paid investors what they believed were the promised returns on their investment when, in actuality, the money they received back was taken from their own invested principal and from funds obtained from others who invested in the scheme. The purpose of such payments was to lead investors into believing that their money was invested as promised, lulling them into believing that their money was safe, and causing them to

induce others to invest.

15. It was further part of the scheme and artifice to defraud that defendant **RESTEINER** used much of the money invested with him to support a lavish lifestyle which included maintaining a significant home in Lyford Cay, Bahamas, a villa in St. Moritz, Switzerland, a yacht named Apocalypse, an airplane, a helicopter, two Rolls Royce motor cars, two Hummer vehicles, a Porsche Carerra sports car, and other assorted vehicles..

A.    Miles Harbur

16. It was further part of the scheme and artifice to defraud that between May 1997 and June 2000, defendant **RESTEINER** made the misrepresentations described in paragraphs 8 through 10, and provided other false information to Harbur, to induce Harbur invest his own money and to entice Harbur to recruit other investors.

17. It was further part of the scheme and artifice to defraud that defendant **RESTEINER** told Harbur that there was an investing deadline and that Harbur needed to act promptly to get into the program.

18. Following defendant **RESTEINER's** instruction, on various dates between May and October 1997, Harbur wire transferred at least $928,633 from his bank accounts in Boston, Massachusetts to the Osaka account controlled by defendant **RESTEINER**.

19. It was further part of the scheme and artifice to defraud that, commencing in October 1997, defendant **RESTEINER** periodically transferred money from the Osaka bank account to Harbur claiming it was a return on Harbur's investment. This money was transferred to an account in the name of New England Holdings at Barclays Bank, Nassau, Bahamas, which was controlled by Harbur.

20. It was further part of the scheme and artifice to defraud that defendant **RESTEINER** provided Harbur with wiring instructions in the event that Harbur's friends and family were interested in putting money into his trading program.

21. Harbur referred at least ten other individuals to defendant **RESTEINER**'s investment scheme, in large part by repeating the false information provided by defendant **RESTEINER** to potential investors. These individuals, who included John Rutherford, Mary Reed, Marilyn Rinker, Court Kleinedler, Nathan Harbur (Harbur's brother), Andrew Teich and Jay Teich (Harbur's brother-in-laws); Rusty Jones, Peter Stodd, and Margaret Pinkham, invested over $5,800,000 with defendant **RESTEINER**. Harbur initially told investors to transfer funds to the SAM account, at defendant **RESTEINER**'s direction. Later in the scheme, defendant **RESTEINER** told Harbur to instruct investors to either transfer funds to the WSSC account or to refer them to the Resource F program run by VonStrasdas and Dyer.

22. It was further part of the scheme and artifice to defraud that on various dates between March 1998 and May 2000, defendant **RESTEINER** paid Harbur fees for referring new investors to his investment program.

23. It was further part of the scheme and artifice to defraud that starting in October 1998 and continuing thereafter until May 2000, defendant **RESTEINER** transferred money from his Osaka, SAM, and WSSC accounts to Harbur's New England Holdings account at Barclay's Bank. This money, as directed by defendant **RESTEINER**, was purportedly a return on Harbur's investment with defendant **RESTEINER**, fees or commissions paid to Harbur for referring investors to defendant **RESTEINER**, and for Harbur to make periodic payments, typically monthly, to the investors he had referred to defendant **RESTEINER**.

i.     John Rutherford

24.    It was further part of the scheme and artifice to defraud that in late November/early December 1997, Harbur promoted defendant **RESTEINER**'s investment program to John Rutherford by repeating the misrepresentations made to him by defendant **RESTEINER** as described in paragraphs 8 through 10.

25.    Thereafter, at the direction of defendant **RESTEINER**, Harbur instructed Rutherford to wire transfer $2 million to an account in the name of Premiere Mercantile, at Barclays Bank, PLC, Nassau, Bahamas, for investment with defendant **RESTEINER**.

26.    It was further part of the scheme and artifice to defraud that on December 2, 1997, defendant **RESTEINER** signed a promissory note which acknowledged receipt of Rutherford's funds, guaranteed Rutherford a return of 10% per month on his investment with defendant **RESTEINER**, and guaranteed a letter from the bank of repayment of Rutherford's principal in one year.

ii.    Nathan Harbur

27.    It was further part of the scheme and artifice to defraud that in November 1998, Harbur introduced his brother, Nathan Harbur, to defendant **RESTEINER**.

28.    It was further part of the scheme and artifice to defraud that during this meeting, defendant **RESTEINER** made the misrepresentations described in paragraphs 8 through 10 to Nathan Harbur. Specifically, **RESTEINER** told Nathan Harbur that he was offering an investment opportunity that promised monthly returns of 4 to 5% based on the trading of off-balance sheet financial notes. Defendant **RESTEINER** further told Nathan Harbur that he was making such a large return by buying high interest notes at a discount and selling them at par or above thereby

generating a quick profit. Defendant **RESTEINER** further told Nathan Harbur that he would arrange to sell the notes to a third party before buying them.

29. It was further part of the scheme and artifice to defraud, as designed by defendant **RESTEINER**, that Harbur promoted the investment program to his brother, both by repeating the misrepresentations made to him by defendant **RESTEINER** and by telling his brother of the returns he had made on his investment with defendant **RESTEINER**.

30. It was further part of the scheme and artifice to defraud that, as directed by defendant **RESTEINER**, Harbur referred his brother to VonStrasdas to invest money with defendant **RESTEINER**.

31. It was further part of the scheme and artifice to defraud that in December 1998, VonStrasdas sent Nathan Harbur a private placement memorandum for Resource F, the investment vehicle offered by defendant **RESTEINER** and managed by VonStrasdas and Dyer.

32. It was further part of the scheme and artifice to defraud that once VonStrasdas learned that Nathan Harbur intended to use money from his Individual Retirement Account to invest in Resource F that he referred Nathan Harbur to Dyer. Dyer, in turn, referred Nathan Harbur to Richard Hufnagel, a broker at Piper Jaffray.

33. It was further part of the scheme and artifice to defraud that in May 1999, Nathan Harbur received a letter from David A. Conary of Mustang Capital, LLC, Bethel, Maine. This letter enclosed a Piper Jaffray New Account Form; a roll-over certificate, and a self-directed IRA application. On or about May 18, 1999, Nathan Harbur returned the completed forms, sent by Federal Express, to Conary at Mustang.

34. On or about May 21, 1999, Nathan Harbur sent VonStrasdas, by Federal Express,

the documents needed to initiate his investment in Resource F. These documents were sent to Resource F's Palm Beach, Florida address.

35. It was further part of the scheme and artifice to defraud that in June 1999, Nathan Harbur received a letter from VonStrasdas confirming his $200,000 investment in Resource F from his Piper Jaffray IRA account.

36. It was further part of the scheme and artifice to defraud that, thereafter, as directed by defendant **RESTEINER**, Nathan Harbur received monthly payments on his Resource F investment from approximately August 1999 through February or March 2000, totaling approximately $53,540. These monthly payments came from principal funds invested by Nathan Harbur and others. Nathan Harbur received no further payments after May 2000.

    iii.    <u>Andrew Teich</u>

37. It was further part of the scheme and artifice to defraud that in 1998, defendant **RESTEINER** approached Andrew Teich with an investment opportunity while Teich was vacationing in the Bahamas. Harbur previously introduced defendant **RESTEINER** to Andrew Teich, his brother-in-law, in 1996.

38. It was further a part of the scheme and artifice to defraud that during this 1998 meeting, defendant **RESTEINER** told Andrew Teich how he had become wealthy through off-balance sheet trading, a secret trading activity typically limited to the ultra rich. Defendant **RESTEINER** further told Andrew Teich that his investment was safe and promised monthly returns of 4 percent.

39. It was further part of the scheme and artifice to defraud, as designed by defendant **RESTEINER**, that Harbur promoted the investment program to Andrew Teich, by both repeating

the misrepresentations made to him by defendant **RESTEINER** and by telling his brother-in-law of the returns he had made on his investment with defendant **RESTEINER**.

40. Upon his return to the United States, Andrew Teich decided to refinance his home in Wayland, Massachusetts and use the equity from his home to invest with defendant **RESTEINER**. Between May 1998 and August 1998, Andrew Teich wire transferred over $200,000 to the SAM account at Barclays Bank, Nassau, Bahamas.

41. It was further part of the scheme and artifice to defraud, as designed by defendant **RESTEINER** and at his direction, that Andrew Teich received periodic payments on his investment until the monthly payments stopped in May 2000. These payments came from principal funds invested by Andrew Teich and others. Teich received no further payments after that time.

    iv.    <u>Arthur and Margaret Pinkham</u>

42. It was further part of the scheme and artifice to defraud, that sometime in 1997, Arthur Pinkham and other members of the CCS in Boston participated in a meeting at defendant **RESTEINER**'s home in the Bahamas. At this initial meeting, defendant **RESTEINER** made the basic investment pitch, which was later repeated by defendant **RESTEINER** at a meeting at the CCS in Boston.

43. Thereafter, defendant **RESTEINER** and his wife were dinner guests of Arthur Pinkham and his wife, Margaret. During dinner, defendant **RESTEINER** again discussed his investment opportunity. Defendant **RESTEINER** told Margaret Pinkham that the investment was safe, that she could take their money back at any time, and a one year investment would reap an annual return of 50 percent. When Margaret Pinkham told defendant **RESTEINER** that she was

11

interested, but did not have the multi-millions needed to invest, defendant **RESTEINER** told her that he would make an exception for her and allow a $100,000 investment.

44. It was further part of the scheme and artifice to defraud that defendant **RESTEINER** then gave Margaret Pinkham contact information for VonStrasdas, the individual defendant **RESTEINER** said would handle the paperwork for her.

45. In January 2000, Margaret Pinkham sent two wire transfers, totaling $100,000, from the Savings Bank of Manchester, Willimantic, Connecticut, to the WSSC account in the Bahamas controlled by defendant **RESTEINER**.

46. It was further part of the scheme and artifice to defraud, as designed and directed by defendant **RESTEINER**, that Margaret Pinkham received one payment check for $5,300 shortly after she invested. This payment came from principal funds invested by Margaret Pinkham and others. Margaret Pinkham received no other payments or return of her initial investment.

v.  Marilyn Rinker

47. It was further part of the scheme and artifice to defraud, as designed and directed by defendant **RESTEINER**, that Marilyn Rinker, an acquaintance of Miles Harbur, invested with defendant **RESTEINER**, individually and in her role as chairman of the boards of directors of the Principle Foundation, the Powell Crown Foundation, and Camp Leelanau-Kohana. Rinker made or directed the following investments with defendant **RESTEINER**, both through transfers to the SAM account controlled by defendant **RESTEINER** and through investments made in Resource F, as follows:

| DATE | INVESTOR | AMOUNT |
|---|---|---|
| 02/25/98 | Marilyn Rinker | $500,000.00 |
| 06/09/98 | Marilyn Rinker | $500,000.00 |
| 09/04/98 | Powell Crown Foundation | $500,000.00 |
| 03/01/99 | Marilyn Rinker | $200,000.00 |
| 04/01/99 | Powell Crown Foundation | $200,000.00 |
| 04/28/99 | Principle Foundation | $200,000.00 |
| 09/20/99 | Principle Foundation | $100,000.00 |
| 10/19/99 | Marilyn Rinker | $100,000.00 |
| 12/20/99 | Principle Foundation | $100,000.00 |
| 12/23/99 | Camp Leelanau-Kohana | <u>$200,000.00</u> |
|  |  | $2,600,000.00 |

48.  It was further part of the scheme and artifice to defraud, as designed and directed by defendant **RESTEINER**, that Marilyn Rinker and the entities for which she directed investments be made with defendant **RESTEINER**, received monthly payments until they stopped in early 2000. These payments came from principal funds invested by Marilyn Rinker and others.

   vi.  <u>Charles G. Howland</u>

49.  It was further part of the scheme and artifice to defraud, as designed and directed by defendant **RESTEINER**, that Charles G. Howland received a private placement memorandum and other documents, by mail and by facsimile, regarding an investment in Resource F, the investment vehicle offered by defendant **RESTEINER** and managed by VonStrasdas and Dyer.

50.  On or about May 3, 1999, Howland invested in the Resource F program by wire transferring $200,000 to Resource F.

13

51. From in or around June 1999 through May 2000, Howland received monthly payments on his investment with Resource F and defendant **RESTEINER**. These payments came from principal funds invested by Charles Howland and others.

vii. Stephen J. Schaubert

52. It was further part of the scheme and artifice to defraud, as designed and directed by defendant **RESTEINER**, that Stephen J. Schaubert learned about a potential investment in Resource F from Harbur, who referred Schaubert to VonStrasdas.

53. Schaubert received a private placement memorandum and other documents, by mail and by facsimile, regarding an investment in Resource F, the investment vehicle offered by defendant **RESTEINER** and managed by VonStrasdas and Dyer.

54. On or about May 1, 1999, Schaubert invested in the Resource F program by mailing two checks totaling $200,000 to VonStrasdas.

55. From in or around June 1999 through May 2000, Schaubert received ten wire transfers as payments on his investment with Resource F and defendant **RESTEINER**.

viii. Chet Manchester

56. It was further part of the scheme and artifice to defraud, as designed and directed by defendant **RESTEINER**, that Chet Manchester learned about a potential investment in Resource F from Harbur, who referred Manchester to VonStrasdas.

57. In May and June 1999, Manchester received a private placement memorandum and other documents, by Federal Express and mail, regarding an investment in Resource F, the investment vehicle offered by defendant **RESTEINER** and managed by VonStrasdas and Dyer.

58. On or about June 10, 1999, Manchester invested in the Resource F program

offered by defendant **RESTEINER** by delivering a check in the amount of $80,000 to VonStrasdas.

59. From in or around July 1999 through May 2000, Manchester received monthly payments on his investment with Resource F and defendant **RESTEINER**. These payments came from principal funds invested by Chet Manchester and others.

ix. Norman G. Bleichman

60. It was further part of the scheme and artifice to defraud, as designed and directed by defendant **RESTEINER**, that Norman G. Bleichman learned about a potential investment in Resource F from Harbur, who referred Bleichman to VonStrasdas.

61. In May 1999, Bleichman telephoned VonStrasdas and subsequently received a private placement memorandum and other documents, by facsimile, regarding an investment in Resource, the investment vehicle offered by defendant **RESTEINER** and managed by VonStrasdas and Dyer.

62. On or about August 2, 1999, Bleichman invested in the Resource F program offered by defendant **RESTEINER** by mailing, by Federal Express, two checks totaling $200,000 to VonStrasdas in Palm Beach, Florida.

63. From in or around September 1999 through May 2000, Bleichman received monthly payments on his investment with Resource F and defendant **RESTEINER**. These payments came from principal funds invested by Norman Bleichman and others.

B. Donald Chamberlin

64. It was further part of the scheme and artifice to defraud that defendant **RESTEINER** attracted new investors with the assistance of Donald Chamberlin, an investment

15

advisor who referred his clients to defendant **RESTEINER**'s trading program.

65. It was further a part of the scheme and artifice to defraud that defendant **RESTEINER** represented to Chamberlin that defendant **RESTEINER** had a safe investment program, that Chamberlin's clients could get a significant return by investing with defendant **RESTEINER**, and that defendant **RESTEINER** had a net worth of over $50,000,000.

66. It was further part of the scheme and artifice to defraud that defendant **RESTEINER** directed Chamberlin to establish corporations in the Bahamas and bank accounts at Barclays Bank, PLC, Nassau, Bahamas, in order to facilitate investments by Chamberlin's clients. As directed by defendant **RESTEINER**, Chamberlin established companies and accounts in the names of European Growth Fund, International Growth Ltd., and Badefisa, S.A., in the Bahamas.

67. It was further part of the scheme and artifice to defraud that on various dates between June 1997 and July 1999, defendant **RESTEINER**, assisted by Chamberlin, successfully solicited money from numerous victims who transferred at least $1,200,000 to European Growth Fund, a bank account at Barclays Bank, Nassau, Bahamas. Funds transferred to this account were subsequently transferred to the Osaka account controlled by defendant **RESTEINER**.

68. It was further part of the scheme and artifice to defraud that on various dates between September 1998 and June 1999, defendant **RESTEINER** transferred funds purporting to be a return on the investments made by the European Growth Fund investors from the Osaka and SAM accounts to the European Growth Fund account at Barclays Bank.

69. It was further part of the scheme and artifice to defraud that on various dates between March 1999 and July 1999, defendant **RESTEINER**, assisted by Chamberlin,